ORIGINAL

1 NOSSAMAN LLP
Patrick J. Richard (Cal. Bar 131046)
2 prichard@nossaman.com
James H. Vorhis (Cal. Bar 245034)
3 jvorhis@nossaman.com
50 California Street, 34th Floor
4 San Francisco, California 94706
Telephone No.: 415.398.3600
5 Fax No.: 415.398.2438

6 Attorneys for Plaintiff Federal Deposit Insurance
Corporation as Receiver for Alliance Bank

7

8                UNITED STATES DISTRICT COURT

9                CENTRAL DISTRICT OF CALIFORNIA

10                     WESTERN DIVISION

11                    SACV12 2212 JST(ANx)

12 FEDERAL DEPOSIT INSURANCE          Case No. —
CORPORATION AS RECEIVER FOR
13 ALLIANCE BANK,                     **COMPLAINT FOR NEGLIGENCE,
                                      GROSS NEGLIGENCE, AND
14        Plaintiff,                  BREACH OF FIDUCIARY DUTY**

15 v.                                 **DEMAND FOR JURY TRIAL**

16 CURTIS REIS; DANIEL JACKSON;
MICHAEL ABRAMS; ROBERT
17 BOTHNER; D. GREGORY SCOTT;
and ROBERT THOMPSON,
18
        Defendants.
19

20

21

22

23

24

25

26

27

28

COMPLAINT FOR NEGLIGENCE, GROSS NEGLIGENCE, AND BREACH OF
FIDUCIARY DUTY

1    Plaintiff, the Federal Deposit Insurance Corporation as Receiver for Alliance
2 Bank ("FDIC-R"), alleges as follows:

3 **I.    INTRODUCTION**

4    1.    The FDIC-R brings this case in its capacity as Receiver for Alliance
5 Bank ("Alliance" or "Bank"), pursuant to authority granted by 12 U.S.C. § 1821.
6 The FDIC-R seeks to recover losses of at least $35 million that the Bank suffered
7 because Defendants – six of the Bank's former directors and/or executive officers –
8 irresponsibly approved inappropriate, high-risk commercial real estate ("CRE") and
9 acquisition, development, and construction ("ADC") loans (collectively, the "Loan
10 Transactions") between December 7, 2005 and March 28, 2008.

11    2.    The $35 million damage claim is based on 16 loans to five separate
12 borrower relationships.  Defendants pursued a high-risk strategy in an extremely
13 over-valued market to permit the Bank to loan millions of dollars to individuals and
14 entities who had no adequate means to repay the loans in the event the proposed
15 projects failed or underperformed.  Prudent lending practices for CRE and ADC
16 loans require an adequate secondary source of repayment or support, which is fully
17 documented as sufficient at the time of loan approval.

18    3.    In derogation of their duty to engage in safe and sound lending
19 practices, Defendants irresponsibly pursued an unsustainable course of rapid asset
20 growth concentrated in high-risk CRE and ADC loans.  They did so 10 years into
21 the longest up cycle in housing in at least 50 years, and in markets that were highly
22 over-valued, extremely risky and uncertain.  These factors significantly increased
23 the risks of the proposed raw land and development loans.  Rather than increase
24 caution, tighten underwriting and minimize risk, Defendants failed to adopt
25 adequate loan evaluation and approval practices to manage the increased risk.
26 Defendants routinely violated the Bank's Loan Policy in approving the Loan
27 Transactions, and other loans, failed to require an adequate secondary source of

28    - 2 -

COMPLAINT FOR NEGLIGENCE, GROSS NEGLIGENCE, AND BREACH OF
FIDUCIARY DUTY

repayment, failed to fully mitigate the known risks identified in the approval memoranda, and failed to address the high-risk and highly over-priced markets into which Defendants were approving further construction loans.

4.     The directors and officers of the Bank, including Defendants, were the keepers and architects of the Bank's Loan Policy. The Defendants' roles on the Directors Loan Committee ("DLC") and the Board of Directors required that they ensure compliance with the Loan Policy. Defendants repeatedly ignored Loan Policy violations that were clear on the face of the authorizing Credit Memoranda received by the Defendants prior to approving the Loan Transactions ("Credit Memo"), and failed to ensure that those increased risks were fully mitigated. Defendants abdicated their responsibilities to ensure that loans were made in accordance with the Bank's Loan Policy and safe and sound lending practices.

5.     Defendants failed to inform themselves sufficiently before making lending decisions, acted more as management than as outside directors when approving particular loans, and irresponsibly disregarded actual market data and known risk information. By closing their eyes to available information that Defendants knew or should have known, Defendants put their own plans for balance sheet growth and potential personal gain ahead of the Bank's interest in prudent lending.

6.     Defendants approved loans without taking into consideration the lack of consistent income and liquid assets of the borrowers and guarantors. On many of the Loan Transactions, Defendants did not require the documentation required by Alliance's Loan Policy, including current financial statements and income tax returns, and did not require the borrowers to provide a cash investment of 15% of the total cost of the project, as required by the Loan Policy. Defendants also failed to abide by the Loan Policy requirement that any party holding a 20% equity interest in a partnership provide a guaranty. Defendants also failed to obtain or analyze

- 3 -

1 global cash flow statements, a significant risk because many of the borrowers and
2 guarantors for the Loan Transactions were providing guarantees for multiple
3 projects at the same time.

4  7.  As members of the DLC, Defendants each voted to approve at least
5 four of the 16 Loan Transactions that are addressed in this Complaint, and no
6 Defendant voted against any of the Loan Transactions.  Liability is not based solely
7 on loan approval because each Defendant breached his duties to the Bank as
8 described herein.

9  8.  Defendants are jointly and severally liable in an amount not less than
10 $35 million, according to proof at trial, for losses incurred on the 16 Loan
11 Transactions that were approved in violation of prudent lending practices and the
12 Bank's Loan Policy.

13 **II.  BACKGROUND**

14  9.  Alliance was founded in Culver City, California in 1980.  Alliance was
15 a state-chartered commercial bank.  Until 1997, Alliance was a relatively small bank
16 with total assets of approximately $44 million.  In the 2002-2003 time frame,
17 Alliance embarked on an aggressive growth strategy based on an increase in CRE
18 and ADC loans for residential projects in southern California.  Before Defendants
19 approved any of the Loan Transactions, Defendants had ample warnings of the
20 adverse and changed market conditions and increased risks.  The Bank's rapid
21 growth led to an overconcentration of CRE and ADC loans at a point in time when
22 those particular markets were highly over-valued, exceptionally risky, and, for most
23 of the Loan Transactions, already demonstrating adverse market conditions by the
24 time of loan approval.  Alliance was wholly owned by its holding company,
25 Alliance Bancshares California ("ABNS" (the NASDAQ trading symbol)).

26  10.  Despite the increased risk of these types of loans, Defendants failed to take
27 measures to improve the Bank's loan approval process for CRE and ADC lending

28 - 4 -

COMPLAINT FOR NEGLIGENCE, GROSS NEGLIGENCE, AND BREACH OF
FIDUCIARY DUTY

1 | activities to prevent the type of irresponsible lending practices described herein.

2 |     11.    On February 6, 2009, the California Department of Financial

3 | Institutions ("CDFI") closed Alliance and appointed the FDIC as receiver.

4 | **III.   THE PARTIES**

5 |     **A.   PLAINTIFF**

6 |     12.    The FDIC is a corporation organized and existing under the laws of the

7 | United States of America. 12 U.S.C. § 1811, *et. seq.* The FDIC was appointed as

8 | Receiver for Alliance on February 6, 2009. Pursuant to 12 U.S.C. §

9 | 1821(d)(2)(A)(i), the FDIC succeeded to all rights, titles, powers, and privileges of

10 | Alliance, Alliance's shareholders, accountholders and depositors, including, but not

11 | limited to, Alliance's claims against the Bank's former directors and officers as set

12 | forth herein.

13 |     **B.   DEFENDANTS**

14 |     13.    Defendant Curtis Reis ("Reis") served as President of Alliance from

15 | 1986 to 2005, and was Chairman of the Board of Directors and Chief Executive

16 | Officer at all relevant times. At all times relevant hereto, Reis was a voting member

17 | of the DLC. Reis was a significant shareholder of ABNS. As of December 31,

18 | 2007, Reis owned or controlled approximately 27.9% of the outstanding shares of

19 | ABNS.

20 |     14.    Defendant Daniel Jackson ("Jackson") joined Alliance in or about 1997

21 | as Manager of its real estate division. He became President and Chief Operating

22 | Officer in 2005, and he served in those capacities until Alliance's failure in February

23 | 2009. At all times relevant hereto, Jackson was a voting member of the DLC.

24 | Jackson was a significant shareholder of ABNS. As of April 21, 2008, Jackson

25 | owned or controlled at least 55,100 shares of the outstanding shares of ABNS.

26 |     15.    Defendants Reis and Jackson are collectively referred to in this

27 | Complaint as the "Officer Defendants."

28 |

COMPLAINT FOR NEGLIGENCE, GROSS NEGLIGENCE, AND BREACH OF
FIDUCIARY DUTY

1    16.    Defendant Michael Abrams ("Abrams") served as a director of Alliance

2    from at least 2005 until Alliance's failure in February 2009. At all times relevant

3    hereto, Abrams was a voting member of the DLC. Abrams was also a director of

4    ABNS. Abrams was a significant shareholder of ABNS. As of April 21, 2008,

5    Abrams owned or controlled 127,050 shares of the outstanding shares of ABNS.

6    17.    Defendant Robert Bothner ("Bothner") served as a director of Alliance

7    from at least 2005 until Alliance's failure in February 2009. At all times relevant

8    hereto, Bothner was a voting member of the DLC. Bothner was also a director of

9    ABNS. Bothner was a significant shareholder of ABNS. As of April 21, 2008,

10    Bothner owned or controlled 131,603 shares of the outstanding shares of ABNS.

11    18.    Defendant D. Gregory Scott ("Scott") served as a director of Alliance

12    from at least 2005 until Alliance's failure in February 2009. At all times relevant

13    hereto, Scott was a voting member of the DLC. Scott was also a director of ABNS.

14    Scott was a significant shareholder of ABNS. As of April 21, 2008, Scott owned or

15    controlled 150,824 shares of the outstanding shares of ABNS.

16    19.    Defendant Robert Thompson ("Thompson") served as a director of

17    Alliance from at least 2005 until Alliance's failure in 2009. At all times relevant

18    hereto, Thompson was a voting member of the DLC. Thompson was also a director

19    of ABNS. Thompson was a significant shareholder of ABNS. As of April 21,

20    2008, Thompson owned or controlled 292,109 shares of the outstanding shares of

21    ABNS.

22    20.    Defendants Abrams, Bothner, Scott, and Thompson are collectively

23    referred to as the "Director Defendants." The Officer Defendants and Director

24    Defendants are referred to collectively as "Defendants."

25    **IV.    JURISDICTION AND VENUE**

26    21.    This Court has subject matter jurisdiction over this matter, as actions in

27    which the FDIC is a party are deemed to arise under federal law pursuant to 12

28

- 6 -

COMPLAINT FOR NEGLIGENCE, GROSS NEGLIGENCE, AND BREACH OF
FIDUCIARY DUTY

1   U.S.C. § 1811, *et. seq.*, 12 U.S.C. § 1819(b)(1) and (2), and 28 U.S.C. §§ 1331 and

2   1345.

3       22.    This Court has personal jurisdiction over Defendants because (a)

4   Defendants are all residents of California and/or (b) the actions by Defendants

5   described in this Complaint were performed in California.

6       23.    This Court also has personal jurisdiction over Defendants pursuant to

7   California Code of Civil Procedure § 410.10.

8       24.    Pursuant to 28 U.S.C. § 1351(b), venue is proper in the Central District

9   of California because a substantial part of the events and omissions giving rise to the

10  claims in the Complaint occurred in this judicial district.

11  **V.   FACTUAL ALLEGATIONS**

12      **A.   Defendants' Actions Caused Alliance to Have an Excessive**
13               **Concentration of CRE and ADC Loans**

14      25.    Defendants caused Alliance to pursue a rapid and aggressive growth

15  strategy through risky CRE and ADC lending for projects in Southern California.

16  These types of loans are more speculative than other types of loans due to, among

17  other reasons, the lack of a present cash flow source, uncertainties of development

18  and sale, and the need for adequate secondary sources of repayment. Prudent

19  lending in this segment of banking requires sound underwriting, timely evaluation

20  and response to economic trends impacting the industry, and strict adherence to

21  prudent lending policies and standards. The rapid growth of Alliance caused it to

22  have a substantial overconcentration of CRE and ADC loans.

23      26.    Defendants continued to permit the over-concentration of CRE and

24  ADC loans at Alliance in late 2005 through early 2008. Defendants were

25  consistently aware of the over-concentrations in CRE and ADC loans, and of the

26  significant risks posed by that heavy concentration in speculative residential

27  construction loans. The entire loan portfolio had doubled in size between December

28  

- 7 -

COMPLAINT FOR NEGLIGENCE, GROSS NEGLIGENCE, AND BREACH OF
FIDUCIARY DUTY

1    31, 2004 and June 20, 2006.  Despite knowing this, Defendants failed to take
2    reasonable actions to reduce the concentration of these speculative loans.

3        27.    By June 2008, Alliance's asset quality and loan portfolio were critically
4    deficient due to the high level of loan losses and adverse classifications related to
5    Defendants' poor approval practices for CRE and ADC loans.  As a result of
6    negligent and grossly negligent loan approvals, more than 70% of Alliance's
7    residential construction and land loans outstanding as of June 2008 were adversely
8    classified.

9        28.    In October 2008, ABNS entered into a written agreement with the San
10   Francisco Federal Reserve Bank requiring it to adopt a capital maintenance plan and
11   to obtain a capital infusion.  ABNS did not comply.  Alliance failed on February 6,
12   2009, and the FDIC was appointed as Receiver.

13       **B.    Alliance's Loan Policy**

14       29.    Alliance's Board of Directors delegated responsibility for review and
15   approval of commercial loans and commercial real estate loans to the DLC and the
16   Internal Loan Committee ("ILC").  The DLC, of which the Defendants were
17   members, had authority and the responsibility: (a) to approve, up to Alliance's legal
18   lending limit, all loans above the authority of the ILC; (b) to delegate lending
19   authority within Alliance's legal lending limits and applicable banking regulations;
20   (c) to approve loan policies and loan programs, rates, terms, and conditions; (d) to
21   ensure adequate loan reporting; (e) to review portfolio reports at least monthly; (f) to
22   approve the adequacy of the allowance for loan and lease losses; and (g) to review
23   and make recommendations to the Board on insider loans, loan forecasts, budgets,
24   adverse portfolio trends, and similar matters.  The DLC also was required to
25   approve all material exceptions to Alliance's Loan Policy.  The DLC typically met
26   every two weeks.

27

28

COMPLAINT FOR NEGLIGENCE, GROSS NEGLIGENCE, AND BREACH OF
FIDUCIARY DUTY

1    30.   Alliance maintained an extensive Loan Policy.[1]  That Loan Policy
2    required diligent underwriting and conformity with state and federal law, close
3    monitoring of concentrations of credit, rigorous documentation, and prudent
4    evaluation of risk.  The Loan Policy reflected the level of risks acceptable to the
5    Bank's Board of Directors, and loans deviating from the Loan Policy increased the
6    risk of non-payment.  Defendants violated numerous provisions in Alliance's Loan
7    Policy and approved loans that should not have been approved.

8    31.   Alliance's Loan Policy for real estate loans required that "[t]he
9    borrower's net worth and cash flow must be adequate for the project under
10   consideration." [March 2005 Loan Policy, § 400.00.3.]

11   32.   Interim land development and acquisition loans were required to have a
12   defined source of payment and to be "conservatively margined by an amount
13   appropriate to the term of the loan." [March 2005 Loan Policy, § 400.20.c.]
14   Specifically, with respect to development loans, Alliance's Loan Policy provided
15   that such loans were "to create no greater inventory than the borrower can absorb
16   within six (6) months." [March 2005 Loan Policy, § 400.20.a.]  Where the
17   repayment of the land loan was anticipated to come from a construction loan
18   provided by Alliance, the construction loan was required to be "underwritten to
19   determine if the project will be feasible before the land loan is approved." [March
20   2005 Loan Policy, § 400.20.17.]  The Loan Policy stated that real estate loans "for
21   undefined future uses or speculation are discouraged and considered only as an
22   exception to policy." [March 2005 Loan Policy, § 400.20.17.]

23   33.   With respect to construction loans, Alliance's Loan Policy provided,
24   among other things, that "[t]he borrower should have the income or liquid assets to

25
26   [1]   The following references are to the 2005 Loan Policy.  The 2006 Loan Policy
27   contains identical provisions and was the operative policy for the loans approved in
     2007 and early 2008.

28                                      - 9 -

COMPLAINT FOR NEGLIGENCE, GROSS NEGLIGENCE, AND BREACH OF
FIDUCIARY DUTY

1 carry the project through a longer than anticipated marketing period or have the

2 ability to get a take-out loan," and that "[t]he financial standing of the borrowers

3 should be reviewed to determine the ability of the individuals to inject cash during

4 the construction project, should that become necessary." [March 2005 Loan Policy,

5 §§ 401.00.1.a-b.] Construction loans were further required to have a "minimum

6 cash investment by the borrower of fifteen percent (15%) of the total cost of the

7 project, including interest and point reserves." [March 2005 Loan Policy,

8 §§ 401.00.1.h.]

9       34.    Alliance's Loan Policy identified factors associated with real estate

10 loans that indicated when a loan was originated on an unsound basis:

11     While some real estate loans become troubled because of a general
       down trend in the market, others become troubled because they were
12     originated on an unsound or a liberal basis.  Common examples of
       these types of problems include:
13
       a.    Loans with no, or minimal borrower equity.
14
       b.    Loans on speculative, undeveloped property where the
15     borrowers' only source of repayment is the sale of the property.

16     c.    Loans based on land values that have been driven up by rapid
       turnover of ownership, but without any corresponding improvements to
17     the property or supportable income projections to justify an increase in
       value.
18
       d.    Additional advances to service an existing loan that lacks
19     credible support for full repayment from reliable sources.

20     e.    Renewals, extensions and refinancing that lack credible support
       for full repayment from reliable resources and that do not have a
21     reasonable repayment schedule.

22     [March 2005 Loan Policy, § 400.30 ("Indicators of Troubled Real
       Estate Projects").]
23

24      35.    Alliance's Loan Policy stated that, in evaluating a guarantor for a loan,

25 Alliance should evaluate the guarantor's credit support with respect to Liquidity,

26 Assets/Liabilities, Outside Net Worth, and Cash Flow.  [March 2005 Loan Policy,

27 § 205.10.]

28                              - 10 -

COMPLAINT FOR NEGLIGENCE, GROSS NEGLIGENCE, AND BREACH OF
FIDUCIARY DUTY

36.   Alliance's Loan Policy stated that Alliance should receive personal financial statements for guarantors that were prepared within the last 90 days and tax returns for the three preceding years. [March 2005 Loan Policy, § 203.00.2-3.] The 2006 Loan Policy slightly amended the financial statement requirements, requiring that borrowers needed to provide personal financial statements prepared within the last nine months, preferably within the last 90 days.  The Loan Policy also stated that "Income tax returns on the principals and guarantors should be analyzed to determine the individual's discretionary income." [March 2005 Loan Policy, § 204.20.]

37.   Alliance's Loan Policy required additional due diligence by Alliance where a guarantor had a high net worth.  It stated:

> As the net worth of the individual increases, schedules listing real estate, listed and unlisted stocks, loans, mortgages, debt service, etc. become important.  The method of valuing assets is of utmost importance.  In the final analysis, the loan officer must study each personal financial statement and determine adequacy based on (1) the information provided, (2) the degree to which the Bank is depending on the individual as the source of repayment, and (3) the amount of the statement.

[March 2005 Loan Policy, § 204.70.]

38.   Alliance's Loan Policy stated that "Reported liquid assets and real estate values (for R/E outside of the subject property) should be verified independently.  Bank and brokerage statements and property sales comps are the most readily available sources of verification." [March 2005 Loan Policy, § 205.50.]

39.   Defendants routinely ignored, and permitted others to ignore, Alliance's Loan Policy requirements.  Particularly with respect to the Loan Transactions, Alliance failed to require sufficient equity injections by the principals as a condition of loan approval and failed to obtain sufficient financial information from guarantors, which would have shown that the loans lacked sufficiently strong

- 11 -

COMPLAINT FOR NEGLIGENCE, GROSS NEGLIGENCE, AND BREACH OF FIDUCIARY DUTY

1   guarantors at the time of loan approval. Had Defendants complied with the standard
2   of care, they would not have approved the Loan Transactions.

**C.  Defendants Approved Loans in Violation of Prudent Lending Practices**

40.    Alliance suffered significant injury as a result of loans approved, permitted or ratified by Defendants while a member of the DLC, that did not comply with the Bank's Loan Policy and prudent lending practices. Each of these loans was approved by the Defendants who agreed to serve on the DLC during their tenure on this committee.

41.    In approving these loans, the DLC failed to adhere to safe and sound lending practices. Specifically, among other problems, Defendants failed to assess the repayment abilities of borrowers and guarantors, relied excessively on real estate appraisals during a declining real estate market, violated Alliance's Loan Policy, miscalculated or permitted excessive loan to value ratios ("LTV"), failed to require the borrower to have 15% cash equity in the project, renewed loans without adequate underwriting or obtaining additional security, or otherwise violated prudent lending standards. Defendants were aware of these problems, deficiencies and increased risks before approving the loans. Many of the deficiencies were apparent from the Credit Memo for each Loan Transaction provided to Defendants as members of the DLC, or as officers. These loans were made in violation of the general safety and soundness standards of 12 C.F.R. § 364.101 Appendix A, the general underwriting standards of 12 C.F.R. § 364.010 Appendix A, and the real estate lending standards of 12 C.F.R. § 365.2 Appendix A.

42.    The losses from the Loan Transactions total in excess of $35 million.

**138/14 Portfolio, LLC Loan**

43.    On February 14, 2007, the DLC, including Defendants Bothner, Reis, Jackson, Scott, and Abrams, approved a loan of $30,300,000 to 138/14 Portfolio,

- 12 -

1  LLC ("138/14") to finance the purchase of 14 properties in Long Beach, California

2  and the conversion of the 16 apartment buildings on the properties into

3  condominiums. $21,280,000 of that loan was made immediately available to

4  138/14.

5        44.    The approval of this loan violated prudent lending practices and

6  Alliance's Loan Policy in a number of ways. For example, these Defendants failed

7  to require Alliance's officers to prepare a sufficient market analysis, which violated

8  the Bank's Loan Policy. The low-end condominium market was already in decline

9  by the time this loan was approved, and Defendants knew or should have known

10  that high-risk condominium conversions are particularly susceptible to changing

11  market conditions.

12        45.    Each of these Defendants also failed to properly consider the ability of

13  the guarantors to collectively act as an adequate secondary source of repayment,

14  which violated Alliance's Loan Policy. The guarantors lacked the capacity or liquid

15  reserves to carry a loan of this size if sales faltered, and because of the costs

16  associated with the converted units the rental market would not support the carry

17  costs of the renovated projects if they needed to be rented. Moreover, the guarantors

18  of the project had subpar credit scores.

19        46.    Defendants irresponsibly approved and permitted approval of this loan

20  despite an unacceptably risky project, a grossly inadequate secondary source of

21  repayment and dangerous market conditions. Their approval, consent and

22  ratification under these circumstances was given without even scant care.

23        47.    Only four months after the loan was made, and after Alliance had

24  disbursed over $17 million, 138/14 reported to Alliance that the market for

25  condominiums in the area had collapsed and that it could no longer complete the

26  project as agreed. The loan went into default shortly thereafter and Alliance

27  ultimately foreclosed, realizing a loss of $7,894,009.

28

- 13 -

COMPLAINT FOR NEGLIGENCE, GROSS NEGLIGENCE, AND BREACH OF
FIDUCIARY DUTY

## Shadow Hill Estates, LLC Loans

48.     On February 13, 2008, the DLC, including Defendants Reis, Jackson, Bothner, Scott, and Abrams, approved an extension of credit to Shadow Hills Estates, LLC ("SHE") in the amount of $1,670,000. In 2005, SHE had purchased approximately 66.5 acres of land in Los Angeles for $5.5 million. It made a down payment of $1,500,000 and signed a promissory note payable to the seller for the remaining $4,000,000. SHE was a newly-formed LLC comprised of 13 members, two of whom are individually referred to herein as "DB" and "DM."

49.     Following the purchase, SHE sought a loan from Alliance to develop the land as a high-end gated community. The land would be divided into 14 lots. SHE's plan was to pre-sell lots and have the buyer select a house to be built from a selection of sample designs, and SHE would then begin construction. On June 22, 2005, the DLC, including Defendants Jackson, Reis, Bothner, Scott, and Thompson, approved a $17,775,000 loan to SHE secured by a first trust deed on the site. Alliance was to loan no more than $12,000,000, with the balance being participated to other banks. Defendant Jackson stated that SHE "would not 'go vertical' on the homes until they are sold."

50.     As the result of risks that were known or should have been known to Defendants at the time of loan approval, the project experienced a 12-month delay and cost overruns of approximately $2,610,000.

51.     As a result of the delay, the lots were not finished until May 2007, at which time the real estate market had further slowed considerably. Only two lots had houses built on them. The outstanding balance of the loan was approximately $11,625,000.

52.     Despite Jackson's statement that the borrower would not go vertical until a lot and house were pre-sold, on February 13, 2008, Alliance loaned SHE an additional $1,670,000 to construct more houses. The DLC, including Defendants

- 14 -

Jackson, Bothner, Scott, Abrams, and Thompson, approved this additional credit extension. Sales proceeds from this project were ultimately insufficient to keep the loans current, and SHE went into default. Alliance lost approximately $3,350,834 on the primary loan and $529,000 on the subsequent loan.

53. The Defendants, who approved, consented to and ratified the SHE loan, acted without even scant care and violated Alliance's Loan Policy in a number of ways. For example, Defendants failed to require that the borrower provide a "minimum cash investment" of 15% equity into the project. Specifically, Defendants improperly considered the $4,000,000 promissory note for the purchase of the property as equity, in violation of Alliance's Loan Policy. The $1,500,000 cash component of the property purchase price constituted a cash investment of only about 8.44% equity.

54. Defendants also failed to require compliance with Alliance's Loan Policy regarding guarantors. The loan was guaranteed by DB and DM, two partners of SHE. However, Alliance failed to fully investigate the guarantors' financial situation, failed to reconcile conflicts between the guarantors' financial statements and information from tax returns, failed to obtain required tax returns, and failed to conduct any due diligence to determine the values of the real estate or partnership interests the guarantors claimed to own. Defendants failed to sufficiently analyze the financial information that Alliance did have, and failed to take into account millions of dollars of guarantees that DB had on other troubled construction projects.

### Daniel Bernstein & Associates, Inc. Loans

55. On March 14, 2007, the DLC, including Defendants Bothner, Reis, Jackson, Scott, and Thompson, approved a loan to Daniel Bernstein & Associates, Inc. ("DBAI") in the total amount of $9,582,000 to purchase and develop two properties in Sylmar. Originally, Alliance had approved a loan to DBAI in the

- 15 -

1  amount of $4,150,000 to purchase the land, which it planned to sell to a national
2  homebuilder. However, when the expected national homebuilder failed to
3  materialize, Alliance agreed to loan DBAI $9,582,000 to purchase and develop the
4  site.

5      56. These Defendants nevertheless approved a loan for a high-risk,
6  imprudent project, with a weak borrower, at a time of dangerous and declining
7  market conditions, a decision made without even scant care and reflecting an
8  extreme departure from ordinary care.

9      57. The loan was structured in two parts: a main loan of $6,840,000 that
10  was secured by a first mortgage, and a mezzanine loan of $2,742,000 that was
11  secured by a second mortgage on both properties. The loans were personally
12  guaranteed by DB, who also guaranteed payment of the SHE loans.

13      58. By October 2, 2007, 10 houses were under construction and were
14  nearly complete. However, the market for the houses had continued to deteriorate,
15  and they did not sell. In June 2008, Alliance charged off $1,355,000 from the
16  mezzanine loan. The property continued to decline in value. Although eight houses
17  eventually sold by December 2008, the sale prices were not sufficient to cover the
18  loans, and DBAI defaulted.

19      59. In approving and permitting the loans, Defendants violated Alliance's
20  Loan Policy because the borrower did not have a minimum cash or cash equivalent
21  investment of 15% in the construction project.

22      60. Defendants also violated Alliance's Loan Policy by failing to ensure
23  the guarantors had sufficient financial resources. Specifically, DB did not have
24  sufficient capacity to guarantee the loans considering his status as guarantor of the
25  SHE loans, which each of these Defendants failed to take into account when
26  approving these loans.

27
28

- 16 -

COMPLAINT FOR NEGLIGENCE, GROSS NEGLIGENCE, AND BREACH OF
FIDUCIARY DUTY

1    61.    Defendants knew or should have known of the deteriorating residential

2  real estate market, and the problems experienced with the SHE loan when it made

3  the loans to DBAI.  However, Defendants failed to require any analysis of the effect

4  of the SHE loan on DB's ability to perform on the guaranty or DBAI's ability to

5  perform on the underlying loans, in violation of Alliance's Loan Policy.

6    62.    Considering the size of the SHE loan and the potential loss it could

7  create in conjunction with the fact that in early 2007 the project was behind schedule

8  and over budget, Defendants should not have approved, permitted or ratified these

9  loans to DBAI.

10    63.    Alliance ultimately lost approximately $3,103,823 on this Loan·

11  Transaction.

12                    **11011 Huston Street Partners LLC Loans**

13    64.    On December 7, 2005, the DLC, including Defendants Reis, Jackson,

14  Bothner, Scott and Thompson, approved a restructured construction loan to 11011

15  Huston Street Partners LLC ("Huston") (the DLC minutes refer to Page

16  Construction) for the purchase of a property in North Hollywood and the

17  construction of a 65-unit condominium project.  The loans were structured to consist

18  of a construction loan for $15,168,000 secured by a first trust deed, and a

19  $6,775,000 mezzanine loan secured by a second trust deed.  $8,475,000 of the

20  construction amount ultimately came from a participating bank.  The DLC approved

21  the loan despite an over valued and highly-risky market, and despite inadequate

22  secondary sources of repayment.  The loan documents between the borrower and the

23  Bank were completed on February 9, 2006.

24    65.    In approving and permitting the loans, Defendants violated Alliance's

25  Loan Policy in numerous ways.  For example, Defendants did not require the

26  borrower to contribute the minimum cash investment in the construction project as

27  required by the Loan Policy.  Defendants required Huston to contribute only

28                                  - 17 -

1   $1,944,000 of cash into the project, which was below the 15% equity requirement
2   for construction loans.  Defendants did not require adequate secondary sources of
3   repayment.  Defendants also violated the Bank's Loan Policy by failing to require
4   timely financial statements and tax returns.

5       66.    The project violated loan covenants and defaulted in August 2007.
6   Nevertheless, Defendants Reis, Jackson, Abrams, Bothner, Scott and Thompson
7   approved Huston's request for a 12-month extension and an increase of $1,100,000
8   in the mezzanine loan.

9       67.    Less than a year later, in May 2008, Alliance was still owed
10  $14,000,000, and the condominium units were not selling sufficiently.  Although
11  Alliance was able to sell the notes such that the first loan was paid in full, the
12  balance of the sale proceeds were insufficient to pay off the mezzanine loan,
13  resulting in a loss of $6,230,000.

14      **C2AS, LP Loans**

15      68.    On June 14, 2006, the DLC, including Defendants Reis, Jackson, Scott,
16  Bothner, and Thompson, approved a loan to C2AS, LP ("C2AS") in the amount of
17  $11,235,000 to finance the acquisition of 304 acres of vacant land in Corona,
18  California (the "Sierra Bella Property").  Approval of the loan was negligent,
19  grossly negligent and a breach of Defendants' fiduciary duties because, *inter alia*,
20  the market and subject property were highly over-valued, the project was highly
21  speculative, and the secondary sources of repayment were inadequate because they
22  relied, in part, on unpredictable gambling winnings.  C2AS intended to procure
23  entitlements for the property and then sell it to a national homebuilder.  C2AS was
24  managed by Mr. and Mrs. D, but the loan was personally guaranteed by only Mrs.
25  D.

26      69.    On March 26, 2008, the DLC, including Defendants Reis, Jackson,
27  Bothner, Scott, Thompson, and Abrams, approved an increase to the loan to C2AS

- 18 -

COMPLAINT FOR NEGLIGENCE, GROSS NEGLIGENCE, AND BREACH OF
FIDUCIARY DUTY

1   by \$3,060,320, bringing the total amount loaned to \$14,296,320.  As part of this

2   additional extension, Alliance obtained an appraisal of the Sierra Bella Property,

3   dated as of November 11, 2007, showing that the property had substantially

4   devalued from its 2006 purported value of \$60,500,000 to \$35,000,000.

5       70.   The approval of the C2AS loans violated the Bank's Loan Policy and

6   prudent lending practices in many ways.  Specifically, the documentation provided

7   by the borrowers and guarantors was insufficient to support the amount of the loan,

8   the project was a speculative land development loan of the riskiest type, and there

9   was no adequate analysis of the borrower's financial statements or liquidity of the

10  guarantors.

11      71.   In addition, C2AS was a single-asset entity that had only the real estate

12  collateral as an asset.  The only source of repayment identified for these loans was

13  sale of the collateral either to a national homebuilder or another entity.

14      72.   For the initial loan to C2AS, Alliance did not conduct the investigation

15  of Mrs. D required by Alliance's Loan Policy.  The personal financial statements

16  submitted by Mrs. D, dated May 2006, listed assets of almost \$100 million, but there

17  was a flawed analysis of Mrs. D's adjusted net worth.  Almost all of Mrs. D's

18  personal net worth was from the purported value of single-asset real estate entities

19  formed to develop vacant land in Corona at that time.  No global cash flow analysis

20  was performed.  Mrs. D reported no personal income for 2003, and the income she

21  reported in 2004 appears to have come not from her but from her husband, Mr. D,

22  who was not a guarantor.  In addition, the personal property and other real property

23  assets described in the financial statements were not adequately analyzed to

24  determine if there was any equity or whether Mrs. D actually owned those

25  properties.

26      73.   Alliance's Loan Policy required guarantors to have sources of income

27  that provide a "predictable and recurring level of income."  Not only did Mrs. D

28

COMPLAINT FOR NEGLIGENCE, GROSS NEGLIGENCE, AND BREACH OF
FIDUCIARY DUTY

1   have no income in 2003, but much of her listed income in 2004 was from gambling
2   winnings, not a predictable and recurring level of income.  Mrs. D. failed to provide
3   three years of tax returns, as required by the Bank's Loan Policy, which would have
4   shown the instability and lack of income generated by Mrs. D.

5       74.    In determining Mrs. D's net worth and her ability to act as a suitable
6   guarantor, Alliance, among other things, should not have included the value of any
7   entity whose assets were already pledged or mortgaged as collateral to Alliance.
8   Substantially all of Mrs. D's assets were already pledged or mortgaged as collateral
9   to Alliance.  Defendants violated Alliance's Loan Policy requiring that acquisition
10  loans be supported by a suitable guarantor.

11      75.    In addition, by not requiring timely updated appraisals at the time
12  Alliance made further extensions of credit, Defendants violated Alliance's Loan
13  Policy requiring reliable appraisals for loans secured by real property.

14      76.    The C2AS loan ultimately went into default, and Alliance incurred
15  losses of $5,999,684.

16                      **Far West Corona Properties, LP Loan**

17      77.    On July 26, 2006, the DLC, including Defendants Reis, Jackson, Scott,
18  Bothner, and Thompson, approved a loan in the amount of $4,197,000 to Far West
19  Properties, LP ("Far West") to finance the acquisition of 112 acres of vacant land in
20  Corona, California, which the borrowers intended to re-sell.  Far West was managed
21  by Mr. D and Mrs. D, but the loan was personally guaranteed by only Mrs. D.
22  Defendants' approval of another speculative land loan to a non-creditworthy
23  borrower in a dangerous market grossly departed from basic standards of prudent
24  lending.

25      78.    On January 24, 2007, the DLC, including Defendants Jackson, Reis,
26  Scott, Bothner, and Thompson, approved an increase in the loan to Far West of
27  $1,987,000 so that it could purchase an additional 163 acres that adjoined the 112

28                              - 20 -

COMPLAINT FOR NEGLIGENCE, GROSS NEGLIGENCE, AND BREACH OF
                          FIDUCIARY DUTY

1    acres it already owned. These loans were secured by first trust deeds on the Corona

2    properties owned by C2AS and Far West, and by a second trust deed on the Sierra

3    Bella Property.

4        79.    On March 26, 2008, the DLC, including Defendants Reis, Jackson,

5    Bothner, Scott, Thompson, and Abrams approved an increase in the loan to Far

6    West of $2,002,091, bringing the total loan amount to about $8,053,000. This

7    increase also relied on an appraisal done months earlier, in November 2007,

8    showing that the Far West property value had declined dramatically between July

9    2006 and November 2007, from $18,660,000 to $10,000,000, approximately 54%.

10        80.    The approval of the Far West loans violated the Bank's Loan Policy

11    and prudent lending practices in several important ways. Specifically, the

12    documentation provided by the borrowers and guarantors was insufficient to support

13    the amount of each loan, the project was a speculative land development loan of the

14    riskiest type, and there was no adequate analysis of the financial statements or

15    liquidity of the guarantors.

16        81.    Far West was a single-asset entity that had only the real estate collateral

17    as an asset. The only source of repayment identified for this loan was the eventual

18    re-sale of the collateral either to a national homebuilder or another entity.

19        82.    For the initial loan to Far West, Defendants did not conduct the

20    investigation of Mrs. D required by Alliance's Loan Policy. The personal financial

21    statements submitted by Mrs. D, dated May 2006, listed assets of almost $100

22    million, but there was a flawed analysis of Mrs. D's adjusted net worth. Almost all

23    of Mrs. D's personal net worth was from the purported value of the C2AS and Far

24    West loan collateral. No global cash flow analysis was performed. Mrs. D reported

25    no personal income for 2003, and the income she reported in 2004 appears to have

26    come not from her but from her husband, Mr. D, who was not a guarantor. In

27    addition, the personal property and other real property assets described in the

28

- 21 -

COMPLAINT FOR NEGLIGENCE, GROSS NEGLIGENCE, AND BREACH OF<br>FIDUCIARY DUTY

financial statements were not adequately analyzed to determine if there was any equity or whether Mrs. D actually owned those properties.

83.   Alliance's Loan Policy required guarantors to have sources of income that provide a "predictable and recurring level of income." Not only did Mrs. D have no income in 2003, but much of her listed income in 2004 was from gambling winnings, not a predictable and recurring level of income. Mrs. D. failed to provide three years of tax returns, as required by the Bank's Loan Policy, which would have shown the instability and lack of income generated by Mrs. D.

84.   In determining Mrs. D's net worth and her ability to act as a suitable guarantor, Alliance, among other things, should not have included the value of any entity whose assets were already pledged or mortgaged as collateral to Alliance. Substantially all of Mrs. D's assets were already pledged or mortgaged as collateral to Alliance. Defendants violated Alliance's Loan Policy requiring that acquisition loans be supported by a suitable guarantor.

85.   In addition, by not requiring timely updated appraisals at the time Alliance made further extensions of credit, Defendants violated Alliance's Loan Policy requiring reliable appraisals for loans secured by real property.

86.   The Far West loans ultimately went into default, and Alliance incurred a loss of at least $6,025,030.

**MS North Valley Partners, LP Loan**

87.   On November 22, 2006, the DLC, including Defendants Jackson, Reis, Scott, Bothner, and Thompson, approved a $8,300,000 loan commitment to MS North Valley Partners, LP ("MSNV") to fund the construction of a 26-unit town-home development in Pacoima, California. Loan approval was negligent, grossly negligent, inherently speculative and far too risky. The appraiser reported that the land for this project had changed hands six times over a period of two years.

- 22 -

COMPLAINT FOR NEGLIGENCE, GROSS NEGLIGENCE, AND BREACH OF FIDUCIARY DUTY

88.   MSNV was a newly-created entity with no assets other than the property. MSNV was managed by MWH Builders, Inc ("MWH"), which was owned by MH, a long-time customer of Alliance. MSNV was owned 49.5% by MH's trust, 49.5% by SA (another customer of Alliance), and 1% by MWH.

89.   The property was secured by a first trust deed, and repayment of the loan was guaranteed by MH, but not SA.

90.   Defendants violated prudent lending practices and the Bank's Loan Policy in multiple ways. Specifically, Defendants allowed Alliance to violate its Loan Policy requiring the borrower to have a minimum cash or cash equivalent investment of 15% of the total cost of a construction project. The supposed justification for this exception to the Loan Policy was that the property had appreciated in value from $600,000 in August 2005 to $2,700,000, and thus the LTC ratio was 84.62% when "appreciated property equity" is considered. However, Alliance's Loan Policy did not allow appreciated equity to be considered when calculating the correct LTC values under these circumstances.

91.   Defendants failed to require an adequate analysis of the guarantors' ability to support the loan. Nearly all of the identified net worth consisted of over-valued, illiquid real property and an interest in closely-held entities that owned and developed real property. MH's liquid net worth was only about $750,000 at the time. Accordingly, Alliance's only significant sources of repayment on the loan (sale of the property and/or recourse to the guarantors) were wholly contingent on real estate values in an over-valued market in the longest up-cycle in decades. When real estate values fell, MH lacked the ability to perform on the guarantees.

92.   Defendants also violated Alliance's Loan Policy by failing to require a guarantee from SA, who owned 49.5% of MSNV. Such failure to obtain this guarantee was a violation of Alliance's Loan Policy, which required guarantees be

- 23 -

COMPLAINT FOR NEGLIGENCE, GROSS NEGLIGENCE, AND BREACH OF FIDUCIARY DUTY

1    obtained from any person that owns or controls 20% or more of the borrowing

2    entity.

3        93.    The repeated transfer of the property before the loan was made should

4    have raised concerns about potential churning to increase the purported value of the

5    raw land, especially in light of the apparent increase in raw land value from

6    $600,000 to $2,700,000 during that short time period.

7        94.    By December 2007, MSNV could no longer afford to pay interest on

8    the loan while it attempted to sell the property.  Ultimately, Alliance foreclosed on

9    the property and realized a loss on this Loan Transaction of at least $784,077.

10    **MSB Killion Partners, LP Loan**

11        95.    In 2005, Alliance loaned MSB Killion Partners, LP ("MSB Killion"),

12    another entity controlled by MH and SA, $4,000,000 of the $9,225,000 needed to

13    purchase property in Sylmar, California, which was to be used for the development

14    of a 45-unit condominium complex at a point where the market was highly risky and

15    over-valued.

16        96.    Alliance's appraisal department evaluated the property in November

17    2006 and found that the property had declined in value and was worth, "as is," only

18    $7,875,000.

19        97.    Nevertheless, on May 18, 2007, the DLC, including Defendants

20    Jackson, Reis, Bothner, Scott, and Thompson, approved $2,400,000 in so-called

21    "mezzanine" financing to assist with the construction of condominiums on the

22    property.  The new $2,400,000 loan was secured by a second trust deed.  In addition

23    to the deed of trust, MH, SA, and MWH provided personal guarantees.  This loan

24    typifies the fundamental disregard of basic tenets of prudent lending pervasive

25    during Defendants' stewardship.  The loan should not have been approved because

26    it was a work-out loan masqueraded as a performing loan in obvious violation of the

27    Loan Policy.

28    

- 24 -

COMPLAINT FOR NEGLIGENCE, GROSS NEGLIGENCE, AND BREACH OF
FIDUCIARY DUTY

98.   Defendants made several exceptions to Alliance's Loan Policy in approving and permitting this loan, including (a) loaning at an LTV of 77.11%, which exceeded Alliance's 75% LTV limits for this type of loan, (b) taking a second deed of trust rather than a first deed of trust as required for construction loans, and (c) failing to require MSB Killion to have a 15% cash investment in the property, which violated Alliance's equity requirement. There were also serious deficiencies with the Credit Memo for this project, including the identification of the secondary source of repayment as a bulk sale of the finished project without any analysis of the projected bulk value of the completed project.

99.   The Loan Policy exceptions were made because of the relationship of MH and SA with Defendant Jackson or others at Alliance, rather than legitimate business reasons. The exceptions were approved without considering adequately, if at all, the several problem loans which MH and SA, and their related entities, already had with Alliance at the time of approving the additional mezzanine financing.

100.   Alliance sustained losses from this Loan Transaction of at least $2,400,000.

**MS Woodman Partners, LP Loan**

101.   On July 2, 2007, the DLC, including Defendants Jackson, Reis, Bothner, Scott, and Thompson, approved a $5,088,000 loan to MS Woodman Partners, LP ("MS Woodman"), another MH and SA development project. The stated purpose of the loan was to refinance a land loan on vacant property, on which MS Woodman was going to build a 61-unit condominium development. The term of the loan was six months; the loan was scheduled to mature on January 10, 2008 and was to be paid off by a construction loan that MS Woodman was attempting to obtain. For Defendants to approve a work-out loan to pay off another lender in a

- 25 -

COMPLAINT FOR NEGLIGENCE, GROSS NEGLIGENCE, AND BREACH OF FIDUCIARY DUTY

1  deteriorating market and in violation of the Bank's Loan Policy, again reflects a

2  grossly inept and irresponsible breach of prudent lending practices by Defendants.

3      102.  MS Woodman was owned 49.5% by MH's trust, 49.5% by SA, and 1%

4  by MWH. MH guaranteed the loan, but SA did not.

5      103.  Defendants violated Alliance's Loan Policy in connection with this

6  loan by, among other things, (a) calculating the wrong value for the LTV, (b)

7  approving a loan with an LTV higher than that permitted by the Loan Policy without

8  justifying an exception, (c) using outdated appraisals, and (d) using Alliance and

9  borrower "estimates" in lieu of required appraisals.

10     104.  In addition, Defendants violated Alliance's Loan Policy that required

11  that where the primary source of repayment for a loan was a construction loan from

12  Alliance, the construction loan must be underwritten to determine if the project will

13  be feasible before the land loan is approved.  [Alliance Loan Policy § 400.20.1

14  (December 2006)].  Defendants knew or should have known by July 2007 that the

15  proposed project was not feasible.  Additional deficiencies in the Credit Memo

16  included the failure to identify the mezzanine lender to be repaid, failure to disclose

17  the purchase price of the primary collateral, and the failure to provide any market

18  information, among other problems.  Defendants should not have approved,

19  permitted or ratified this loan.

20     105.  In addition, Defendants violated Alliance's Loan Policy by failing to

21  require a guarantee from SA on this loan, even though he owned 49.5% of MS

22  Woodman.

23     106.  Defendants also violated prudent lending practices by making this loan

24  after MH had informed them with respect to the loan to another one of his entities,

25  MSNV, that its proposed town-home development project was no longer

26  economically feasible due to the decline in the real estate market.  Not only were

27  these Defendants on notice of significant trouble in the town-home and

28

- 26 -

COMPLAINT FOR NEGLIGENCE, GROSS NEGLIGENCE, AND BREACH OF
FIDUCIARY DUTY

1    condominium development market at the time Alliance made this loan, but they

2    knew that the guarantor of this loan, MH, was over-extended, experiencing financial

3    trouble with his projects, and not creditworthy.

4        107.   MS Woodman never commenced construction on the property because

5    the project was not economically feasible.  Nevertheless, after the loan matured,

6    these Defendants extended it to September 10, 2008, with no appraisal and waiving

7    extension fees.

8        108.   Alliance ultimately foreclosed on the property and sustained losses on

9    this Loan Transaction of at least $3,276,599.

10                        **TVP Associates L.P. Loan**

11       109.   On September 19, 2007, the DLC, including Reis and Jackson,

12   approved a $580,000 loan to another entity related to MH and SA, TVP Associates,

13   LP, to finance the construction of a single-family residential development in Sylmar,

14   California.  Comerica Bank ("Comerica") provided a primary construction loan for

15   the principal amount of $8,347,000 secured by a first trust deed.  The Alliance loan

16   was mezzanine funding secured by a second trust deed.  As with the MSB Killion

17   loan, this loan fell well outside the Loan Policy as a secondary financing

18   commitment behind a first position construction loan.

19       110.   The property was appraised on July 6, 2007 as having an "as

20   completed" retail value of $11,160,000, and an LTV based thereon of 80%.

21       111.   There were several violations of Alliance's Loan Policy in connection

22   with this loan.  Although the loan was booked as a non-revolving line of credit, it

23   was in substance a construction loan because the sole security for the loan was the

24   property and improvements being constructed thereon.  The LTV ratio was based on

25   the "as completed value," and the LTV ratio of 80% was above Alliance's limit for

26   construction loans of 75%.  Securing the loan by a second trust deed also violated

27   Alliance's Loan Policy § 401.00.3(a) (December 2006), which provided that "only

28                              - 27 -

1   first deeds of trust will be approved" as collateral in connection with construction

2   related loans. Finally, although the loan was nominally supported by guarantees of

3   MH and MWH, both those guarantors were already guaranteeing millions of dollars

4   of other Alliance loans, and almost all their net worth was based on real estate that

5   was declining in value.

6      112.   On June 23, 2008, nine months after the loan had been made, the entire

7   balance of the loan was charged off based on an updated appraisal reflecting that the

8   property had a "bulk value" of less than the senior Comerica loan. Neither MH nor

9   MWH was a viable source of repayment on the loan.

10     113.   Alliance lost at least $465,495 as a result of this Loan Transaction.

11  **VI.   CLAIMS FOR RELIEF**

12              **FIRST CLAIM FOR RELIEF**

13              **(Breach of Fiduciary Duties)**

14              **(Against the Officer Defendants)**

15     114.   The FDIC-R realleges and incorporates by reference each of the

16  allegations contained in paragraphs 1 through 113 of this Complaint, inclusive, as

17  though fully set forth herein.

18     115.   As officers of Alliance, the Officer Defendants owed Alliance the

19  fiduciary duty of due care to ensure its safe and sound operation. As officers, the

20  Officer Defendants were obliged to act in good faith, in the best interests of

21  Alliance, and with such care, including a duty of reasonable inquiry, as a reasonably

22  prudent bank officer would exercise under similar circumstances.

23     116.   As officers of Alliance, the Officer Defendants occupied positions of

24  trust with respect to Alliance, as defined under California law. As such, they owed

25  Alliance fiduciary duties of loyalty and good faith, and were required to perform

26  their duties in a manner each of them believed to be in the best interests of Alliance,

27  at the expense and ahead of their own personal interests.

28                          - 28 -

COMPLAINT FOR NEGLIGENCE, GROSS NEGLIGENCE, AND BREACH OF
FIDUCIARY DUTY

117.   The Officer Defendants also had a fiduciary duty to keep both themselves and Alliance's Board fully informed of the risks arising from Alliance's lending activities.

118.   The Officer Defendants also had a fiduciary duty of care to ensure that Alliance had prudent lending policies in place, that Alliance complied with those policies, and that in determining whether to make loans Alliance considered factors such as the ability of borrowers and guarantors to repay the loans and the value of the security for the loans.

119.   The Officer Defendants had a fiduciary duty to adhere to loan policies that adequately addressed the risks inherent in Alliance's loan portfolio and to require adherence to those policies by subordinate.

120.   Especially in regard to Alliance's high-risk core activities of CRE and ADC lending, the Officer Defendants owed Alliance the duty to use reasonable care, skill, and diligence in the performance of their duties.

121.   Each of the Officer Defendants breached these above-described fiduciary duties and abdicated his duties as an officer by, among other things:

a.     allowing Alliance to develop and maintain a dangerous concentration of CRE and ADC loans;

b.     allowing Alliance to approve loans that had questionable prospect of repayment and that violated Alliance's Loan Policy, including, the loans described herein, where the Officer Defendants knew, or but for their failure to conduct a reasonable investigation of material facts should have known, that:

i.     the borrowers lacked the financial resources to repay the loan, as would have been apparent had Defendants exercised due diligence in requiring, reviewing, and analyzing financial information from such

- 29 -

borrowers and as evidenced in some instances by the financial obligations owed by the borrowers on other real property as to which Alliance was the lender;

    ii.    the guarantors lacked sufficient capacity to guarantee the loan, as would have been apparent had Defendants exercised due diligence in requiring, reviewing, and analyzing financial information from such guarantors and as evidenced in some instances by the financial obligations owed by the guarantors on other real property as to which Alliance was the lender;

    iii.    the value of the real property securing the debt was insufficient to provide adequate security for the loan;

    iv.    the appraisals received by Defendants were outdated and therefore inadequate to support the loans, especially in light of the highly over-priced and then deteriorating residential real estate market in Southern California during the relevant period;

    v.    the borrowers' "estimates" of the value of real property were unreliable and were not a reasonable substitute for the required appraisals;

    vi.    the borrowers' cash investment did not meet Alliance's Loan Policy that borrowers provide a "minimum cash investment" of 15% equity into the project;

    vii.    the LTV ratio on such loans exceeded Alliance's 75% LTV limit for residential construction

- 30 -

COMPLAINT FOR NEGLIGENCE, GROSS NEGLIGENCE, AND BREACH OF FIDUCIARY DUTY

1      loans and Alliance's 65% LTV limit for land development

2      loans;

3            viii.   some of the loans were secured by second

4      trust deeds in violation of an Alliance Loan Policy that

5      only first trust deeds would be approved as collateral in

6      connection with a construction related loan;

7      c.   failing to require guarantees from significant partners of a

8  limited partnership borrower, in violation of Alliance's Loan Policy;

9      d.   allowing Alliance to continue to fund existing loans and to

10  make additional loans to borrowers on existing loans:

11         i.   notwithstanding changed circumstances, such

12      as project delays and the decline in real estate prices, that

13      made the projects economically nonviable; and

14        ii.   in violation of loan conditions, such as the

15      requirement that the borrower would not commence

16      construction until a lot and house were pre-sold;

17      e.   making exceptions to Alliance's Loan Policy based upon

18  personal relationships with borrowers, rather than legitimate business

19  reasons; and

20      f.   putting their own pecuniary interests and compensation

21  ahead of protecting the Bank.

22  122.  As a direct and proximate result of the Officer Defendants' breaches of

23  the fiduciary duties, the FDIC-R has suffered damages in an amount to be proven at

24  trial in excess of $35 million.

25

26

27

28

- 31 -

## SECOND CLAIM FOR RELIEF

### Negligence (California law)

### (Against the Officer Defendants)

123.   The FDIC-R realleges and incorporates by reference each of the allegations contained in paragraphs 1 through 122 of this Complaint, inclusive, as though fully set forth herein.

124.   The Officer Defendants, acting in their capacity as officers of Alliance Bank, owed to the Bank the duty to use reasonable care, skill and diligence in the performance of their duties, especially in connection with the Bank's CRE and ADC lending.

125.   Each of the Officer Defendants was negligent by abdicating his responsibilities to the Bank in connection with the Bank's commercial lending functions by, among other things:

a.   unreasonably failing to investigate material facts about proposed loans that were apparent on the face of the Credit Memo for those loans, and the risks the loans posed to the Bank;

b.   unreasonably failing to ensure that any loans they approved were underwritten in a safe and sound manner;

c.   allowing Alliance to develop and maintain a dangerous concentration of CRE and ADC loans; and

d.   allowing Alliance to approve loans that had questionable prospect of repayment and that violated Alliance's Loan Policy, including, the loans described herein, where the Officer Defendants knew, or but for their failure to conduct a reasonable investigation of material facts should have known, that the borrowers and guarantors were not creditworthy, the purpose of the loans was too risky, and the

- 32 -

market too dangerous for the proposed loans, as set forth in the more particular allegations, including Paragraph 122(b)(i)-(viii), above.

126.   As a direct and proximate result of the Officer Defendants' negligence, the FDIC-R has suffered damages in an amount to be proven at trial in excess of $35 million.

## THIRD CLAIM FOR RELIEF

### (Breach of Fiduciary Duties)

### (Against the Director Defendants)

127.   The FDIC-R realleges and incorporates by reference each of the allegations contained in paragraphs 1 through 126 of this Complaint, inclusive, as though fully set forth herein.

128.   As directors of Alliance, the Director Defendants owed Alliance the fiduciary duty of due care to ensure its safe and sound operation.  As directors, the Director Defendants were obliged to act in good faith, in the best interests of Alliance and of its shareholders, and with such care, including a duty of reasonable inquiry, as a reasonably prudent bank director would exercise under similar circumstances.

129.   As directors of Alliance, the Director Defendants occupied a position of trust with respect to Alliance, as defined under California law.  As such, they owed Alliance fiduciary duties of loyalty and good faith and were required to perform their duties in a manner each of them believed to be in the best interests of Alliance, at the expense of their own personal interests and ahead of their own expectation of profit as a shareholder of Alliance's holding company.

130.   As members of Alliance's Board of Directors with the responsibility for approving loans, the Director Defendants had a duty to make reasonable inquiry and to inform themselves about the loans that they were approving, including,

- 33 -

COMPLAINT FOR NEGLIGENCE, GROSS NEGLIGENCE, AND BREACH OF
FIDUCIARY DUTY

1   without limitation, the creditworthiness of the borrowers and guarantors and the

2   value of the real property securing the loan.

3       131.   The Director Defendants also had a fiduciary duty of care to ensure that

4   Alliance had prudent lending policies in place, that Alliance complied with those

5   policies, and that, in determining whether to make loans, Alliance considered factors

6   such as the ability of borrowers and guarantors to repay the loans and the value of

7   the security for the loans.

8       132.   Given the significant concentrations of CRE and ADC loans that the

9   Director Defendants had encouraged and permitted to develop, the Director

10  Defendants' duty of care required them to develop loan policies that adequately

11  addressed the risks inherent in Alliance's loan portfolio and to require adherence to

12  those policies.

13      133.   Especially in regard to Alliance's core activities of CRE and ADC

14  lending, the Director Defendants owed Alliance the duty to use reasonable care, skill

15  and diligence in the performance of their duties.

16      134.   Each of the Director Defendants breached these fiduciary duties of

17  loyalty, good faith and care as a director by, among other things, failing to make

18  reasonable inquiry, to inform himself about, to obtain advice about, or to consider

19  the loans before voting to approve the loans, thereby:

20          a.      allowing Alliance to develop and maintain a dangerous

21      concentration of CRE and ADC loans;

22          b.      allowing Alliance to approve loans that had questionable

23      prospect of repayment and that violated Alliance's Loan Policy,

24      including, the loans described herein, where the Officer Defendants

25      knew, or but for their failure to conduct a reasonable investigation of

26      material facts should have known, that the borrowers and guarantors

27

28                                      - 34 -

COMPLAINT FOR NEGLIGENCE, GROSS NEGLIGENCE, AND BREACH OF
FIDUCIARY DUTY

1    were not creditworthy, the purpose of the loans was too risky, and the

2    market too dangerous for the proposed loans.

3    135.   In these acts and omissions, the Director Defendants abdicated their

4    responsibilities as directors, acted clearly unreasonably in light of the circumstances

5    known to them at the time, and failed to perform their duties with such care,

6    including reasonable inquiry, as an ordinarily prudent bank director in a like

7    position would exercise, and put their own potential gain ahead of the safety and

8    soundness of Alliance.

9    136.   As a direct and proximate result of the Director Defendants' breaches

10   of the fiduciary duties, the FDIC-R has suffered damages in an amount to be proven

11   at trial in excess of $35 million.

### FOURTH CLAIM FOR RELIEF

### (Gross Negligence)

### (Against the Director Defendants)

15   137.   The FDIC-R incorporates by reference each of the allegations

16   contained in paragraphs 1 through 136 of this Complaint, inclusive, as though fully

17   set forth herein.

18   138.   Section 1821(k) of FIRREA holds directors of financial institutions

19   personally liable for loss or damage to the institution caused by their "gross

20   negligence," as defined by applicable state law.  California law defines gross

21   negligence as either a want of scant care or an extreme departure from the ordinary

22   standard of care.

23   139.   The Director Defendants had a duty of care to carry out their

24   responsibilities by exercising the degree of care, skill and diligence that an

25   ordinarily prudent bank director would use under similar circumstances.

26   140.   Each of the Director Defendants was grossly negligent in performing

27   his duties, and abdicated his duties as a director by, among other things, failing to

28

- 35 -

COMPLAINT FOR NEGLIGENCE, GROSS NEGLIGENCE, AND BREACH OF
FIDUCIARY DUTY

1   make reasonable inquiry into, to inform himself about, to obtain advice about, or to

2   consider, the loans they approved, thereby:

3         a.    allowing Alliance to develop and maintain a dangerous

4       concentration of CRE and ADC loans, including loans reflecting an

5       extreme departure from ordinary care;

6         b.    allowing Alliance to approve loans that had questionable

7       prospect of repayment and that violated Alliance's Loan Policy,

8       including, the Loan Transactions described herein, where the Director

9       Defendants knew, or but for their failure to conduct a reasonable

10      investigation of material facts should have known, that the borrowers

11      and guarantors were not creditworthy, the purpose of the loans was too

12      risky, and the market too dangerous for the proposed loans, as set forth

13      in the more particular allegations, including Paragraph 122(b)(i)-(viii),

14      above.

15      141.  In these acts and omissions, the Director Defendants abdicated their

16  responsibilities as directors, acted clearly unreasonably in light of the circumstances

17  known to them at the time, and failed to perform their duties with such care,

18  including reasonable inquiry, as an ordinarily prudent bank director in a like

19  position would exercise.

20      142.  The Director Defendants' conduct in carrying out their duties and

21  responsibilities to Alliance constituted a want of scant care and an extreme departure

22  from the ordinary standard of care, as further described in this Complaint.

23      143.  As a direct and proximate result of the Director Defendants' gross

24  negligence, the FDIC-R has suffered damages in an amount to be proven at trial in

25  excess of $35 million.

26

27

28

- 36 -

COMPLAINT FOR NEGLIGENCE, GROSS NEGLIGENCE, AND BREACH OF
FIDUCIARY DUTY

1          **PRAYER**

2          WHEREFORE, the FDIC-R requests for relief against Defendants as follows:

3                    A.      For compensatory damages and consequential damages,

4    jointly and severally, in a minimum amount of $35 million and any excess

5    amount to be proven at trial;

6                    B.      For its costs of suit against all Defendants;

7                    C.      For prejudgment interest at the statutory rate under

8    California law;

9                    D.      For attorneys' fees, costs for the investigation and

10   litigation, and interest; and

11                   E.      For such other and further relief as this Court deems just

12   and proper.

13   Dated: December 21, 2012          NOSSAMAN LLP

14

15                                     By: _____

16                                     Patrick J. Richard
                                       Attorneys for Plaintiff Federal Deposit
                                       Insurance Corporation as Receiver for Alliance
17                                     Bank

18

19

20

21

22

23

24

25

26

27

28                                     - 37 -

COMPLAINT FOR NEGLIGENCE, GROSS NEGLIGENCE, AND BREACH OF
FIDUCIARY DUTY

1

## **DEMAND FOR JURY TRIAL**

2  The FDIC-R demands a jury trial.

3

4  Dated: December 21, 2012      NOSSAMAN LLP

5

6                                By: _Patrick J Richard nv_____
7                                   Patrick J. Richard
                                    Attorneys for Plaintiff Federal Deposit
8                                   Insurance Corporation as Receiver for Alliance
                                    Bank

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT FOR NEGLIGENCE, GROSS NEGLIGENCE, AND BREACH OF
FIDUCIARY DUTY

ORIGINAL

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
CIVIL COVER SHEET

| I (a) PLAINTIFFS (Check box if you are representing yourself ☐) | DEFENDANTS |
|---|---|
| FEDERAL DEPOSIT INSURANCE CORPORATION AS RECEIVER FOR ALLIANCE BANK | CURTIS REIS; DANIEL JACKSON; MICHAEL ABRAMS; ROBERT BOTHNER; D. GREGORY SCOTT; and ROBERT THOMPSON |

| (b) Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.) | Attorneys (If Known) |
|---|---|
| Patrick J. Richard (Cal. Bar 131046) NOSSAMAN LLP 50 California Street, 34th Floor San Francisco, California 94111 Telephone No.: 415.398.3600 | |

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☒ 1 U.S. Government Plaintiff
☐ 2 U.S. Government Defendant
☐ 3 Federal Question (U.S. Government Not a Party)
☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify):
☐ 6 Multi-District Litigation
☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☒ Yes ☐ No (Check 'Yes' only if demanded in complaint.)
**CLASS ACTION under F.R.C.P. 23:** ☐ Yes ☒ No    ☐ **MONEY DEMANDED IN COMPLAINT: $** at least $35,000,000.00

**VI. CAUSE OF ACTION** (Cite the U. S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
12 U.S.C. § 1821

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS PERSONAL INJURY | TORTS PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | ☐ 310 Airplane | ☐ 370 Other Fraud | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 710 Fair Labor Standards Act |
| ☐ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | ☐ 530 General | ☐ 720 Labor/Mgmt. Relations |
| ☒ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 535 Death Penalty | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 540 Mandamus/ Other | ☐ 740 Railway Labor Act |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 340 Marine | **BANKRUPTCY** | ☐ 550 Civil Rights | ☐ 790 Other Labor Litigation |
| ☐ 470 Racketeer Influenced and Corrupt Organizations | ☐ 151 Medicare Act | ☐ 345 Marine Product Liability | ☐ 22 Appeal 28 USC 158 | ☐ 555 Prison Condition | ☐ 791 Empl. Ret. Inc. Security Act |
| ☐ 480 Consumer Credit | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | **FORFEITURE / PENALTY** | **PROPERTY RIGHTS** |
| ☐ 490 Cable/Sat TV | | ☐ 355 Motor Vehicle Product Liability | **CIVIL RIGHTS** | ☐ 610 Agriculture | ☐ 820 Copyrights |
| ☐ 810 Selective Service | ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 360 Other Personal Injury | ☐ 441 Voting | ☐ 620 Other Food & Drug | ☐ 830 Patent |
| ☐ 850 Securities/Commodities/ Exchange | ☐ 160 Stockholders' Suits | ☐ 362 Personal Injury-Med Malpractice | ☐ 442 Employment | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 840 Trademark |
| ☐ 875 Customer Challenge 12 USC 3410 | ☐ 190 Other Contract | ☐ 365 Personal Injury-Product Liability | ☐ 443 Housing/Acco-mmodations | | **SOCIAL SECURITY** |
| ☐ 890 Other Statutory Actions | ☐ 195 Contract Product Liability | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 444 Welfare | ☐ 630 Liquor Laws | ☐ 61 HIA(1395ff) |
| ☐ 891 Agricultural Act | ☐ 196 Franchise | **IMMIGRATION** | ☐ 445 American with Disabilities – Employment | ☐ 640 R.R.& Truck | ☐ 862 Black Lung (923) |
| ☐ 892 Economic Stabilization Act | **REAL PROPERTY** | ☐ 462 Naturalization Application | ☐ 446 American with Disabilities – Other | ☐ 650 Airline Regs | ☐ 863 DIWC/DIWW 405(g)) |
| ☐ 893 Environmental Matters | ☐ 210 Land Condemnation | ☐ 463 Habeas Corpus-Alien Detainee | ☐ 440 Other Civil Rights | ☐ 660 Occupational Safety /Health | ☐ 864 SSID Title XVI |
| ☐ 894 Energy Allocation Act | ☐ 220 Foreclosure | ☐ 465 Other Immigration Actions | | ☐ 690 Other | ☐ 865 RSI (405(g)) |
| ☐ 895 Freedom of Info. Act | ☐ 230 Rent Lease & Ejectment | | | | **FEDERAL TAX SUITS** |
| ☐ 900 Appeal of Fee Determi-nation Under Equal Access to Justice | ☐ 240 Torts to Land | | | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 950 Constitutionality of State Statutes | ☐ 245 Tort Product Liability | | | | ☐ 871 IRS-Third Party 26 USC 7609 |
| | ☐ 290 All Other Real Property | | | | |

**FOR OFFICE USE ONLY:** Case Number: **SACV12 2212**

AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.

CV-71 (05/08) | CIVIL COVER SHEET | Page 1 of 2

American LegalNet, Inc. www.FormsWorkflow.com

## UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
### CIVIL COVER SHEET

**VIII(a). IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed?  ☒ No ☐ Yes
If yes, list case number(s): _____

**VIII(b). RELATED CASES:** Have any cases been previously filed in this court that are related to the present case?  ☒ No ☐ Yes
If yes, list case number(s): _____

Civil cases are deemed related if a previously filed case and the present case:

(Check all boxes that apply)  ☐ A. Arise from the same or closely related transactions, happenings, or events; or
                            ☐ B. Call for determination of the same or substantially related or similar questions of law and fact; or
                            ☐ C. For other reasons would entail substantial duplication of labor if heard by different judges; or
                            ☐ D. Involve the same patent, trademark or copyright, _and_ one of the factors identified above in a, b or c also is present.

**IX. VENUE:** (When completing the following information, use an additional sheet if necessary.)

(a)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named plaintiff resides.
☒  Check here if the government, its agencies or employees is a named plaintiff. If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| | |

(b)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named defendant resides.
☐  Check here if the government, its agencies or employees is a named defendant. If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles County, Orange County | |

(c)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH claim arose.
    Note: In land condemnation cases, use the location of the tract of land involved.

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles | |

\* Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties
Note: In land condemnation cases, use the location of the tract of land involved.

X. SIGNATURE OF ATTORNEY (OR PRO PER): _Patrick J. Richard_  Date 12/21/12
                                      Patrick J. Richard

**Notice to Counsel/Parties:** The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3 -1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. (g)) |

American LegalNet, Inc.
www.FormsWorkflow.com

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge Josephine Tucker and the assigned discovery Magistrate Judge is Arthur Nakazato.

The case number on all documents filed with the Court should read as follows:

## SACV12- 2212 JST (ANx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

===============================================

**NOTICE TO COUNSEL**

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

| | | |
|---|---|---|
| [☑] **Western Division**<br>312 N. Spring St., Rm. G-8<br>Los Angeles, CA 90012 | [ ] **Southern Division**<br>411 West Fourth St., Rm. 1-053<br>Santa Ana, CA 92701-4516 | [ ] **Eastern Division**<br>3470 Twelfth St., Rm. 134<br>Riverside, CA 92501 |

Failure to file at the proper location will result in your documents being returned to you.

COPY

FOR OFFICE USE ONLY

Patrick J. Richard (Cal. Bar 131046)
James H. Vorhis (Cal. Bar 245034)
NOSSAMAN LLP
50 California Street, 34th Floor
San Francisco, California 94706
Telephone No.: 415.398.3600

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| FEDERAL DEPOSIT INSURANCE CORPORATION AS RECEIVER FOR ALLIANCE BANK<br><br>PLAINTIFF(S)<br><br>v.<br><br>CURTIS REIS; DANIEL JACKSON; MICHAEL ABRAMS; ROBERT BOTHNER; D. GREGORY SCOTT; and ROBERT THOMPSON<br><br>DEFENDANT(S). | CASE NUMBER<br><br>SACV12 2212 JST (ANx)<br><br><br>**SUMMONS** |

TO:     DEFENDANT(S):

A lawsuit has been filed against you.

Within ___21___ days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☒ complaint ☐ ____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff's attorney, Patrick J. Richard, whose address is 50 California Street, 34th Floor, San Francisco, California 94706. If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

Dated:  DEC 2 1 2012 _____

Clerk, U.S. District Court

By: ___JULIE PRADO___
Deputy Clerk
(Seal of the Court)



1154

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States. Allowed 60 days by Rule 12(a)(3)].*

FOR OFFICE USE ONLY


American LegalNet, Inc.
www.FormsWorkFlow.com